# St. Vincent's Roman Catholic Congregation of Plymouth, Appellant, *v.* Kingston Coal Company.

*Landlord and tenant—Lease—Lease for more than twenty-one years—Recording acts—Estate for years—Act of May 28, 1715, 1 Sm. L. 94—Statute of limitations—Reversion—Forfeiture—Surface support—Mines and mining.*

A lease for a term of more than twenty-one years is within the purview of the Act of May 28, 1715, 1 Sm. L. 94, so as to vest an estate for years, and not simply an interesse termini, in the lessee without his entering into possession.

Where a lease of land for a term of 999 years, excepting the mineral with the right to mine without liability for injury to the surface, is duly recorded, a person whose adverse possession begins after the recording of the lease, and continues for twenty-one years acquires not the title of the owners of the fee, but the title of the estate for years which had vested in the lessee; and as the lessee had no right to surface support, the title by adverse possession against the lessee gives no such right. In such a case the ouster of the lessee by the persons claiming by adverse possession is not sufficient to start the statute of limitations running against the owners of the land, in the absence of any evidence that the owners had ever forfeited the lease.

While it is true that the tenant cannot deny the landlord's title, it is equally true that the landlord cannot oust the tenant and repossess himself of the premises until the tenancy has been terminated. Until that event occurs the tenant has the right to the exclusive possession under his lease against the landlord as well as against any and all other persons who may not have a superior legal or equitable right. Reversioners and remainder-men are not affected by the statute of limitations until the precedent estate has been determined and their right of entry accrues.

Forfeitures are not favorites of the law, and although a cause of forfeiture exists, it will not be enforced in the absence of affirmative action by the lessor in a contest between the tenant and a third party.

Argued April 13, 1908.    Appeal, No. 204, Jan. T., 1907, by

plaintiffs, from decree of C. P. Luzerne Co., Dec. T., 1905, No. 3, on bill in equity in case of St. Vincent's Roman Catholic Congregation v. The Kingston Coal Company. Before MITCHELL, C. J., FELL, MESTREZAT, POTTER and STEWART, JJ. Affirmed.

Bill in equity for an injunction.

The court below found the facts to be as follows:

The plaintiffs' bill avers (1) their ownership of a certain piece of land in Plymouth township, in this county, containing four and six-tenth acres, and known as St. Vincent's Roman Catholic Cemetery; and (2) that the defendant is operating a mine beneath it and has threatened to remove all the underlying coal, including pillars needed for the proper support of the surface.

The defendant's answer denies that the plaintiffs have any title to any of the coal under the land in question or any right to control or interfere with the mining and removal of the same or any part thereof, alleging (1) that prior to the inception at any title which the plaintiffs may have acquired, a complete and lawful severance of the surface from the subjacent coal had been effected, and (2) that the mineral estate is now vested in the defendant, together with the right to mine and remove all the coal, including pillars, without any obligation to support the surface.

The prayers of the bill are (1) for an injunction to restrain the defendant from " mining the coal, pillars or supports " from beneath the cemetery, " or in any way endangering or disturbing the surface of the same or any part thereof; " and (2) for general relief.

The material facts are found to be as follows:

1. On and prior to January 9, 1866, a large tract of land, embracing that afterwards used as a cemetery, was owned in fee by Henderson Gaylord, W. H. Cool, J. S. Mason, E. H. Frishmuth and W. D. Frishmuth as tenants in common. The evidence shows a recorded title in them deduced through mesne conveyance from the commonwealth; the deed from a former owner to Gaylord having been recorded in 1831, and deeds from him to Cool, Mason and the Frishmuths for their several undivided interests having been recorded in 1855.

2. By a written instrument, dated January 9, 1866, and recorded March 30, 1869, the said owners and their wives leased to one James Dooley for a term of 999 years, at a yearly rental of five cents, the surface or soil of six acres of their said land, adjoining other land of Dooley, and embracing the larger portion of the cemetery lot—all of it, in fact, except a piece at the northwesterly end of the cemetery extending about six and one-half rods in depth and being about eighteen rods wide (the full width of the cemetery inclosure).

This lease (to Dooley) contains the following reservation and agreement :

"Excepting and reserving, however, out of the said lot, piece or parcel of ground, unto the said parties of the first part, their heirs and assigns all the coal and minerals under, in and upon the same, and also the right and privilege of mining and removing all and every part and parcel of the coal and other minerals under and upon the said lot, piece or parcel of land, and every and any part thereof, and of making and driving tunnels, passages and ways, under the surface of said lot, piece or parcel of land, for the purpose of mining and removing any and all the coal and other minerals now owned or may hereafter be acquired or owned by the parties of the first part, their heirs or assigns, on said land or any adjoining or neighboring lands, as fully and entirely as if the said parties of the first part, their heirs or assigns, remained the exclusive owners in fee and still held the exclusive possession of the said surface, right of soil of said lot hereby leased, the said parties of the first part not to transport the said coal and other minerals hereby reserved upon the surface of said lot but in all respects to be at liberty to mine and remove the same and to make and drive tunnels, passages and ways under said surface of said lot and even to remove all pillars or supports and entirely to strip the mine or mines under the said lot, without objection or hindrance and not to be liable to the of the second part heirs or assigns for any injury that may occur to said surface or any building now erected or that may be erected thereafter thereon by reason of mining and removing all said coal and other minerals or by reason of making or driving said tunnels, passages or ways or removing all coal, pillars or supports or entirely stripping

said mine or mines ; and it is further understood that the said parties of the first part their heirs or assigns may drive air shafts through the surface of said lot at any time and in any manner said parties of the first part their heirs or assigns may deem necessary in carrying on their mining operations on said lot, or on adjoining lands. But for any damages done to the said surface by said air shafts the parties of the first part their heirs or assigns are to pay for the said damages, and if the said parties cannot agree the amount as to be paid therefor shall be left to the decision of three disinterested persons one to be selected by each party and if the two cannot agree they shall choose an umpire and the decision of the parties so chosen or of a majority of them, shall be final and conclusive upon the parties . . . . It is further understood and agreed by the parties of the first part their heirs or assigns that they will leave standing two pillars of coal when mining on or under demised premises, to be each 20 by 24 feet square wherever the party of the second part shall elect within two years of the date hereof, for the purpose of supports to the surface on which buildings may be erected, or the party of the second part may designate and desire to build thereon."

It does not appear that Dooley or anyone claiming under him, ever indicated where these two pillars should be located, neither has it been shown that he or they ever entered into possession of the demised premises.

3. By an instrument in writing dated September 29, 1871, and recorded January 8, 1872, Gaylord, Cool, Mason and the Frishmuths " demised, leased and to mine let " to the Wilkes-Barre Coal and Iron Company, all the coal in, upon and under a tract of land containing 257 acres, including within its limits the whole of the lot here in question. This coal lease grants the right to mine and remove all the coal from all the strata except the upper or " Orchard " vein (which does not underlie the cemetery lot), and also excepts the coal under two small pieces of land marked on an appended draft— " surface or right of way for railroad " (not involved in this controversy) and also excepts from its provisions certain surface land laid off for building lots on two portions of the tract marked, respectively, on said draft— " the surface reserved for

building lots" and "surface reserved and sold for building lots" which latter includes the lot in question in this proceeding. This coal lease contains no provision relieving the mining company, its successors or assigns from the obligation to support the surface nor releasing it from damages for any injury thereto that might result from its mining operations.

4. The cemetery lot is a part of lot No. 17, Mountain Tier, Third Division of certified lots in Plymouth township, and is described as follows: Beginning at a corner of Barney street, thence north thirty-four degrees, thirty minutes west, 719 feet (along the line between certified lots Nos. 16 and 17) to a corner; thence south forty-nine degrees, thirty-five minutes west, 297 feet to a corner; thence south thirty-four degrees, forty-nine minutes east, 695 feet to a corner; thence north forty-nine degrees, forty-five minutes east, 112 feet to a point; and thence north fifty-six degrees, fifteen minutes east, 185 feet to the place of beginning; containing four and six-tenths acres of land.

5. As so described the surface of this lot has been fenced and used as a cemetery continuously from the year 1874 until now, by the rector and congregation of St. Vincent's Roman Catholic Church; and during that period their possession of the same has been actual, hostile, adverse, continuous, visible, open, notorious and exclusive.

6. There is no evidence of title to this land in the plaintiffs or any of them other than by adverse possession under the statute of limitations, nor of any claim of title by them to the coal beneath the cemetery lot, nor of any entry upon, or exercise by them of any act of ownership with reference to such coal.

7. The coal upon the Gaylord tract was opened into and mined therefrom by its owners as early as 1864, or two years before the date of the Dooley lease and about ten years before the beginning of the plaintiffs' possession of the cemetery lot. Mining from the Gaylord tract (embracing the coal under the cemetery lot) has continued from time to time as the operations proceeded in the several veins, down to the date of filing of the plaintiffs' bill. The earliest mining directly under the cemetery lot, so far as the evidence shows, appears to have been done in the Bennett vein (the second from the surface at

that point) "several years" before 1881. This was what is known as first mining.

A short time before this proceeding was commenced, a committee of St. Vincent's congregation were notified by the defendant's superintendent that his company contemplated proceeding with the work of removing the pillars and unmined coal left under the cemetery in the process of first mining.

8. That such removal without the substitution of sufficient artificial support would endanger the surface is a fact so self-evident that its embodiment in a formal finding would seem to border on the absurd. Nevertheless, the fact is a material one and it is so found.

The trial judge found as a conclusion of law that the plaintiffs were entitled to the relief which they sought.

Exceptions to the adjudication were sustained by the court in banc, in an opinion by FERRIS, J., which was as follows:

The trial judge found from the evidence that a lease of surface land, including the greater part of the cemetery lot here in question, had been made in 1866 by the owners of the fee to James Dooley for the term of 999 years and had been recorded in the proper office before the plaintiffs' possession began. It was further held that, under the provisions of this lease, the lessee was not entitled to the right of surface support. It was not shown, however, that Dooley or anyone claiming under him had ever entered upon the demised premises. The judge thereupon found as matter of law, (a) that while an interesse termini passed to Dooley, it did not appear that an estate for years in the land had ever vested; (b) that the right of possession, therefore, remained in the owners of the fee; (c) that the plaintiffs' subsequent entry and possession was adverse, not to Dooley (since he had not perfected his leasehold estate by entry), but to the owner of the freehold, and the title acquired under the statute was their title; and (d) that since a severance between the surface and the subjacent mineral strata had been effected by a prior sale of the underlying coal without parting with the right to adequate surface support, the title which the plaintiffs acquired by adverse possession was the fee in the surface with the right to have it supported.

The exceptions are based on the claim that the judge erred in holding that Dooley took a mere interesse termini and never acquired (so far as the evidence shows) an estate for years.

In support of this claim counsel for exceptant contends (1) that the common-law rule (that entry by the lessee is necessary to consummate an estate for years) has been modified by statute, and that the recording of a lease for a term exceeding twenty-one years has been made the equivalent of an entry for the purpose of consummating the relation of landlord and tenant; (2) that, therefore, when Dooley's lease was recorded he ceased to be the mere holder of an interesse termini, and became the tenant of an estate for years, entitled to possession even as against his landlord until his term should be ended by efflux of time or by surrender or forfeiture; (3) that entry by a stranger upon the demised premises with adverse possession for twenty-one years (no surrender or forfeiture of the lease being shown) could only effect the leasehold estate, and that the statute would not begin to run against the holders of the fee until right of entry accrued to the latter, which, under the evidence, has not yet occurred; and, therefore (4) that the estate acquired under the statute by the plaintiffs in the portion of the cemetery lot covered by the Dooley lease was the leasehold interest which that instrument conveyed, which interest, as already stated, did not include the right of surface support.

In opposition to this argument, it is claimed by the plaintiffs (1) that a lease for years is not within the statutory provision that the recording of a deed or conveyance shall be the equivalent of livery and seizin, since livery of seizin was never required to complete the conveyance of an estate less than freehold, and that, therefore, the trial judge was right in holding that, as no entry under the Dooley lease was shown, the plaintiffs' entry and possession was adverse to the only estate in the land which was shown to exist, viz.: the fee in the surface with the right of support; and (2) that, even if the recording acts did apply to a leasehold so as to make recording a substitute for entry by the lessee, still, the plaintiffs' possession being shown to be adverse generally, and not specifically as against the tenant for years only, must be held to be adverse to every interest in the land, and that after

twenty-one years it ripened into a fee simple title; and inasmuch as the owner of the fee had not parted with the right to surface support, that right also, as incident to the fee, was acquired by the plaintiffs under the statute of limitations.

The exceptions thus present for consideration the following questions:

1. Did the execution of the Dooley lease in 1866 and the recording thereof in 1869 vest in the lessee an estate for years?

2. If so, when the plaintiff congregation, in 1874, entered and took possession of so much of the cemetery lot as was embraced in the lease, did the statute of limitations, as to such land, begin to run against the owners of the fee or only as against the owners of the leasehold estate?

## I.

The fifth section of the Act of May 28, 1715, 1 Sm. L. 94, entitled " An Act for acknowledging and recording of deeds," provides as follows:

" V. And be it further enacted, That all deeds and conveyances made or to be made, and proved or acknowledged, and recorded as aforesaid, which shall appear so to be, by indorsement made thereon, according to the true intent and meaning of this act, shall be of the same force and effect here, for the giving possession of seizin, and making good the title and assurance of the said lands, tenements and hereditaments, as deeds of feoffment, with livery and seizin, or deeds enrolled in any of the king's courts of record at Westminster, are or shall be in the kingdom of Great Britain," etc.

Section 6 of the act relates to the effect to be given to the words " grant, bargain, sell," in " deeds to be recorded in pursuance of this act, whereby any estate of inheritance in fee simple shall hereafter be limited to the grantee and his heirs," and contains this proviso:

" Provided always, That this act shall not extend to leases at rack-rent, or to leases not exceeding one-and-twenty years, where the actual possession goes with the lease."

Section 8 provides: " That no deed or mortgage, or defeasible deed, in the nature of mortgages, hereafter to be made shall be good or sufficient to convey or pass any freehold or inheritance, or to grant any estate therein for life or years,

unless such deed be acknowledged or proved and recorded within six months after the date thereof, where such lands lie, as hereinbefore directed for other deeds."

There would seem to be no room for doubt that in their use of the word " deed " in this act, the lawmakers of the province intended to include, as instruments to be recorded, not only " conveyances of lands, tenements and hereditaments " (sec. 2) in the strict technical senses of that phrase, but also leases exceeding one-and-twenty years, and any " deed " intended " to grant any estate . . . . for life or years," even though the latter is but a chattel interest subject to sale by a constable on an execution issued by a justice of the peace : Bismark B. & L. Assn. v. Bolster, 92 Pa. 123.

But whether such leases are within the purview of sec. 5 of the act is not so clear. In the case last cited Mr. Justice TRUNKEY speaking, obiter, of a mortgage of a leasehold duly recorded, but not accompanied by possession, says (p. 131) : " Possibly such mortgage is valid (as against execution creditors) under the act of 1715, the record standing for possession."

In McKee's Lessee v. Pfout, 3 Dall. 486, it was held, in construing sec. 5 of the act of 1715, that " In allowing to deeds recorded the same force and effect as feoffments with livery, the intention is expressly restricted to ' giving possession and seizin, and making good the title and assurance of lands, tenements and hereditaments.' " See also Dunwoodie v. Reed, 3 S. & R. 435, *445–6, *454 ; Lyle v. Richards, 9 S. & R. 322, *334. In McKee's Lessee v. Pfout it was attempted, by a narrow and technical construction of the language of sec. 5, to give to a recorded bargain and sale by a tenant for life the effect of a feoffment with livery of seizin, thus producing a forfeiture of the estate. Chief Justice SHIPPEN said : " The legislature has at various periods, and on a variety of subjects, departed from feudal ceremonies and principles in relation to the transfer of property ; but in the present instance the act of assembly meant only to give to a grant of lands a greater effect upon the estate on recording the deed than could previously have been enjoyed without livery of seizin. It never contemplated that circumstance as an instrument to work a forfeiture, on the common-law doctrine of alienation by ten-

ant for life or years." In commenting upon and following this case, Chief Justice GIBSON, in Estate of Sarah Desilver, 5 Rawle, *111, held that the object and effect of the act was not to make recording the equivalent of a feoffment with livery in all respects, but to make it a substitute for the ancient ceremony for the purpose only of " giving possession and seizin and making good the title and assurance of said lands," etc., evidently meaning the title which the recorded instrument was intended to convey. For example, the recording of the Dooley lease should not be held to enlarge the estate for years, intended to be granted into a freehold on the ground that the act declares that a deed when recorded shall have the effect of a " deed of feoffment with livery and seizin," but rather that it should have the same effect to give possession and vest an estate for years in the lessee as it would have if accompanied by delivery of possession to the latter. In this connection it may be noted that the words used in the act are " possession and seizin." The word " possession " would be superfluous if the legislative intent was to confine this provision to estates of freehold, since " seizin " is possession of such an estate. But when, upon turning to secs. 6 and 8, it is seen that leaseholds exceeding one and twenty years, and also those for a shorter term when actual possession does not go with the lease, are included in the act, it may, perhaps, be fairly claimed that a reason appears for the use of both words. At common law there might be " possession " but could be no " seizin " of an estate for years. But it may possibly be argued that, as the proviso to sec. 6 puts leases exceeding twenty-one years on the same footing with those for a term of less duration where actual possession does not go with the lease (see also sec. 3 of the Act of March 18, 1775, 1 Sm. L. 422), neither could properly be held to be within sec. 5 of the act of 1715, for the legislature could not have meant that recording the instrument should have the effect of " giving possession where possession did not go with the lease, and, moreover, that to so hold would be contrary to the decisions which hold that the act was not intended to enlarge the estate granted. In answer to this argument it is, perhaps, sufficient to say that recording a deed or lease could not possibly be the same thing as giving actual possession of the land, and that the legislative

intent was merely to make the one a substitute for the other so far as possession had been necessary to "make good the title" to the estate intended to be granted.  The main reason for the passage of the recording acts is, as stated in the pre-amble to the supplementary act of 1775, to prevent the evils arising from secret conveyances and incumbrances by provid-ing for publicity in such transactions.  That in this respect a short term lease with "actual possession" differs from one where actual possession does not "go with the lease" is obvious.

We think, therefore, that as implied by sec. 8 of the act of 1715, the legislature intended that the recording of a lease for a term exceeding twenty-one years should make it "good" and "sufficient" to "grant" an "estate" for "years;" and that after such recording actual entry by the lessee should not be necessary "to make good the title" to such es-tate.  It follows that the trial judge was in error in holding the contrary.

## II.

It is earnestly contended by counsel for the plaintiffs that even though the record of the Dooley lease stood for posses-sion so as to vest in the tenant an estate for years, still, since the possession of the tenant is the possession of the land-lord, an ouster of the former would be sufficient to start the statute running against the latter.

We are unable to assent to this proposition.  While for cer-tain purposes the possession of the tenant is said to be the pos-session of the landlord (Thompson v. Kauffelt, 110 Pa. 209, 216), this is so only in a qualified sense, not dissimilar to that in which it is said that the act of an agent within the scope of his agency is the act of the principal.  The tenant stands for the landlord and holds the premises for him, and strictly in subordination to him, during the continuance of the lease. His possession is adverse to all the world except his landlord or those under whom the latter claims.  It is the title of the landlord which gives to the tenant his right of possession.  It is quite as true that the title of the landlord is the title of the tenant as that the possession of the tenant is the possession of the landlord.  But in neither case would such a statement mean that their rights in relation to the land are identical.

Each must respect the right of the other. The tenant may not deny his landlord's title, nor the landlord his tenant's right of exclusive possession. No general right of entry accrues to the landlord until the tenancy has been terminated, either by the expiration of the term of the lease or by surrender, or by such hostile action by the tenant as would justify a forfeiture. And until such general right of entry does so accrue the statute of limitations does not begin to run against the landlord and in favor either of a tenant claiming adversely or a stranger: Shepley v. Lytle, 6 Watts, 500, 506; Newman v. Rutter, 8 Watts, 51, 54; Marple v. Myers, 12 Pa. 122, 126; Willard v. Earley, 22 W. N. C. 122; Trickett, Law of Limitations, secs. 95, 105; Greber v. Kleckner, 2 Pa. 289; French v: Fuller, 40 Mass. 104. In Marple v. Myers, 12 Pa. 122, it was held to be settled law, " both in England and Pennsylvania, that reversioners and remainder-men are not within the purview of these statutes (of limitation) until their right of entry accrues by the determination of the precedent estate, no matter how long that may endure. Thus, where there is a valid existing lease for years the right of entry is postponed until the expiration of the term, and though it may be forfeited by condition broken, yet as the owner is not obliged to take advantage of the forfeiture the continued possession of the tenant for twenty years, without any subsequent act acknowledging the tenancy, will not be counted adverse."

We are, therefore, of opinion that the plaintiff congregation acquired title by adverse possession under the statute.

1. To an estate for years, that is, for the unexpired term of the Dooley lease, but without the right to require the owners of the subjacent strata to support the surface, in so much of the surface of the cemetery lot as that lease includes, the part so included being described as follows, viz.: " Beginning at a point on Barney street (on ' Welsh Hill,' Plymouth township, Luzerne county, Pennsylvania) in line of what is known as the Farrell property; thence north thirty-four and one-half degrees west, 612 feet to a corner; thence south forty-nine degrees and thirty-five minutes west about 291 feet, along the northwesterly line of land leased to James Dooley by Henderson Gaylord et al., by lease recorded in Luzerne county deed book, No. 132, page 3, to the southwesterly line of the ceme-

tery lot, thence south thirty-four degrees forty-nine minutes east 588 feet to a point in the line of what is known as the Black property ; thence north forty-nine degrees forty-five minutes east 112 feet to a point in the line of said property ; and thence from said point north fifty-six degrees fifteen minutes 185 feet to the place of beginning."

2. That the said congregation acquired title by adverse possession to an estate in fee simple in the surface of the remaining portion of the cemetery lot, together with the right to require the owners of the underlying mineral estate to furnish an adequate support to said surface, the portion of the cemetery last aforesaid being described as follows, viz.: " Beginning at a corner where the said northwesterly line of the land leased to James Dooley as aforesaid intersects the northeasterly line of said cemetery lot as now inclosed ; thence north thirty-four and one-half degrees west 107 feet to the northeasterly corner of the said cemetery lot as now inclosed ; thence south forty-nine degrees thirty-five minutes west 291 feet to a corner in line of what is known as the Dwyer property ; thence south thirty-four degrees forty-nine minutes east 107 feet to a corner of said land leased to James Dooley ; and thence along the northwesterly line of said land to the place of beginning.

3. That the plaintiffs' bill should be dismissed as to the portion of the cemetery lot first above described.

4. That the injunction heretofore issued should be modified as stated in the decree nisi, and made permanent as to the second described portion of the cemetery lot.

5. That each party should pay the fees of its own witnesses and the costs of subpœnaing them, and one-half of the other costs in the case.


*John McCahren*, with him *M. J. Mulhall*, for appellants. —The execution of the lease gave Dooley merely an interesse termini—a right to substitute his actual for the owner's constructive possession. Until that was done he acquired no estate or interest in the land itself, and the relation of landlord and tenant remained unconsummated : 2 Black. Com. 144 ; Sennett v. Bucher, 3 P. & W. 392, 393 ; Williams v. Downing, 18 Pa. 60, 63 ; Nat. Gas Co. v. Phila. Co., 158 Pa. 317, 327.

The plaintiffs in this case without in any manner waiving or relinquishing their claim of title by adverse possession to the cemetery lot as asserted and maintained by the pleadings and evidence in this case, now desire to refer to some of the many decisions in other states showing the jealous care and rigid enforcement of the law uniformly exercised by the courts of last resort for the protection of cemeteries and the restraint of acts prejudicial to the resting place of the dead: Boyce v. Kalbaugh, 47 Md. 334; Beatty v. Kurtz, 27 U. S. 566; Cincinnati v. White, 31 U. S. 431; Redwood Cemetery Assn. v. Bandy, 93 Ind. 246; Mowry v. City of Providence, 10 R. I. 52; Hook v. Joyce, 94 Ky. 450.

For eight long years before the church congregation took actual possession of the cemetery lot, Dooley, the lessee, made no effort to comply with the terms of the lease. In such a case the law presumes, that the lessors in virtue of their right to determine or forfeit the lease did so terminate it: McKnight v. Kreutz, 51 Pa. 232.

*A. L. Williams,* for appellee, cited: Yost v. Brown, 126 Pa. 92.

OPINION BY MR. JUSTICE MESTREZAT, May 11, 1908:

The facts of this case are not in dispute and are correctly stated in the opinion of the learned trial judge. The only question raised by this appeal is whether a lease for years is within the purview of the recording acts of this state so as to vest an estate for years in the lessee without his entering into possession. The learned court below answered the question in the affirmative, and its thorough discussion of the question vindicates its conclusion.

The fee simple title to a large tract of land including the premises in dispute was in Gaylord and others in 1866. By a written instrument dated January 9 of that year and recorded in March, 1869, the owners leased about five acres of the tract to James Dooley for a term of 999 years, excepting and reserving all the coal and minerals with the right to mine and remove all and every part thereof without liability for any injury or damage done the surface. By a lease, dated September 29, 1871, and recorded

January 8, 1872, Gaylord and others demised to the predessors in title of the defendant company all the coal in and under their land including the lot claimed by the plaintiffs in this action. This lease grants the right to mine and remove all the coal, but does not relieve the lessee from the obligation to support the surface nor release the lessee from damages for injury that might result to the surface from mining operations. The plaintiffs claim title by adverse possession which began in 1874, and has continued without interruption since that time to the present. The lot has been for many years and is now used as a cemetery by the plaintiffs.

The plaintiffs filed this bill to enjoin the defendant company, the owner of the coal, from mining and removing the coal in such manner or way as to affect the superincumbent surface. The plaintiffs' contention is that by the lease to Dooley there passed to him only an interesse termini and not an estate for years in the land, because of his failure to enter into possession of the premises under the lease. It is, therefore, claimed that the possession of the premises remained in the owners of the fee, and that plaintiffs' subsequent entry and possession were adverse, not to Dooley but to the owners of the fee, and the title acquired by adverse possession under the statute is the title of the owners. If this contention be correct and the plaintiffs' possession was adverse to the owners and not to Dooley, it follows that the defendant company whose rights to the coal accrued by the lease of 1871 which gave them no right to affect the surface by their mining operations had no authority to mine and remove the coal without leaving proper supports to sustain the surface in its natural and unbroken condition. The defendant's contention, however, was, and it was sustained by the court below, that the execution and recording of the lease to Dooley prior to the inception of the plaintiffs' title, vested in the lessee not simply an interesse termini but an estate for years, and that the title acquired by the plaintiffs' adverse possession under the statute of limitations was the title of Dooley, the lessee, and not that of his lessors, the owners of the fee. This conclusion of the court was rested upon its construction of the act of 1715, which makes the recording of an instrument a substitute for a feoffment with livery, thereby " making good the title and assurance of the said lands, tene-

ments and hereditaments as deeds of feoffment with livery and seizin." As pointed out in the opinion of the learned judge, the Dooley lease was within the intendment of the recording acts and the effect of recording it was equivalent to entry into possession under the lease and consequently vested in the lessee an estate for years.

Dooley had a leasehold estate in the surface, and the entry by the plaintiffs in 1874, five years after the recording of his lease, was adverse and hostile to his estate. It was Dooley's possession that the plaintiffs attacked when they entered in 1874. The owners of the fee had no right at that time to the possession of the surface as against Dooley. So far as the facts disclose, the owners had not forfeited the lease and had no right to forfeit it. They have never asserted any right to forfeit the lease, and so far as this record shows the Dooley lease was in 1874, and has since been in full force and effect.

The contention of the appellants that the ouster of the tenant, Dooley, by the plaintiffs would be sufficient to start the statute running against the owners of the land is not tenable. It is true that the tenant cannot deny the landlord's title, but it is equally true that the landlord cannot oust the tenant and repossess himself of the premises until the tenancy has been terminated. Until that event occurs, the tenant has the right to the exclusive possession under his lease against the landlord as well as against any and all other persons who may not have a superior legal or equitable right. Reversioners and remainder-men are not affected by the statute of limitations until the precedent estate has been determined and their right of entry accrues : Marple v. Myers, 12 Pa. 122. This proposition is obviously correct, as it would be most inequitable and unjust to permit the statute of limitations to run against the reversioners or remainder-men until their right of possession accrued and it could be enforced by a proper action. So long as their hands are tied and they are unable to assert their right of possession, they are in no default and the law imposes upon them no penalty. It is a universal rule, with no exceptions so far as we are advised, that the statute of limitations does not begin to run against a party until his right of action accrues.

Forfeitures are not favorites of the law, and although a cause of forfeiture exists, it will not be enforced in the absence of

affirmative action by the lessor in a contest between the tenant and a third party. There is nothing whatever in this record to show any cause of forfeiture of the Dooley lease nor that the lessors ever contemplated a forfeiture of the lease and a repossession by them of the leased premises. The lessors had unquestionably the right to permit Dooley to exercise his rights under the lease notwithstanding he may not have complied with its terms. While they might have enforced a forfeiture at any time that it occurred, it was not compulsory upon them but wholly discretionary and at their pleasure; and if they failed to exercise that right, the plaintiffs, whose only title to the premises is adverse possession, are not in a position to enforce the lessors' right of forfeiture.

The fears of the learned counsel of the plaintiffs that the graves of the dead may be desecrated do not appear to have any substantial foundation. The plaintiffs, and not the defendant company, instituted this action to determine the right of the defendant to remove the coal under the cemetery. The defendant, through its counsel, disavows any intention to exercise its right of withdrawing support from the surface, and thereby endangering the graves in the cemetery. By defending this action, the defendant does not necessarily declare its intention to remove all the coal under the cemetery and thereby break and injure the surface. Its title has been attacked by the plaintiffs, and it was, therefore, put upon the defensive and required to protect the title or surrender it to the plaintiffs. Neither sentiment nor any other consideration required it to submit to an attack made by a party who had no paper title to the premises, and who had record notice of the defendant's title. We have no doubt of the sincerity of the defendant company in disavowing its intention to exercise its right to mine the coal so as to affect the surface of the cemetery lot.

The assignments of error are overruled and the decree is affirmed.